O’NIELL, Chief Justice
 

 (dissenting).
 

 The exception of no cause or right of action in this case is founded upon the reservation in the sale of the 80 acres of land by Samuel C. Tippett to the plaintiffs’ ancestor, Joel E. Cooley. The reservation, was made in these words: “with all pine timber reserved and excepted and withheld from said Joel E. Cooley”. The reason why only pine timber was mentioned is that there was no other timber on the land. This sale of the land by Tippett to Cooley was made on March 13, 1902. The timber had been sold to the Meridian Lumber Company’s authors in title, namely, F. E. and A. N. and W. B. Gloyd, on December 10, 1901, under this description: “all the timber standing, being, and growing” on the 80 acres of land, with the time limit of 50 years in which to take the timber off of the land. If the subsequent sale of the land by Tippett to the Gloyds had been made without mentioning the timber, the Gloyds would have acquired the reversionary right to whatever timber might remain on the land at the expiration of the 50 years from December 10, 1901. See Bodcaw Lumber Co. v. Clifton Heirs,
 
 169
 
 
 *658
 
 La. 759, 126 So. 52. But, when a landowner sells the standing timber on his land, with a time limit on the right of the buyer to take the timber off of the land, and, afterwards, but within the time limit stipulated in the sale of the timber, sells the land to another party and expressly reserves the timber, the buyer of the land does not have any interest whatever in the timber during the time limit stipulated in the sale of it. Hickman v. Enterprise Lumber Co., 159 La. 270, 105 So. 340, 42 A.L.R. 635. See, also, Big Pine Lumber Co. v. Hunt, 145 La. 342, 82 So. 363.
 

 The reservation of the timber, in the sale of the land by Tippett to the plaintiffs’ ancestor, Cooley, was merely an ac- • knowledgment on the part of Tippett and Cooley that Tippett had sold the timber to the Gloyds. The exception of no cause or right of action, therefore, ought to be considered in connection with
 
 the
 
 main defense; that is, that Tippett sold to the Gloyds, from whom the Meridian Lumber Company acquired through mesne conveyances, “all the timber, standing, being and growing” on the 80 acres of land. It is fair to assume that Tippett and the Gloyds intended that the Gloyds or any one to whom they might sell the timber would cut and remove only the merchantable timber. But I cannot believe that Tippett or the Gloyds intended that, even though the Gloyds or someone to whom they might transfer the timber might not take it until near the end of 50 years from the date of the sale, they would have to take the measurements as of the date of the sale. No timber buyer would ever enter into
 
 \
 
 such a contract. The only time when the question of size or merchantable quality of standing timber becomes important, in such a transaction, is when the owner of the timber is about to take it from the land to the sawmill. He does not care then whether the timber was or was not of a merchantable quality, or what its size was, fifty years previous to his severing it from the land. The parties to this transaction never thought for a moment that the buyer of the timber or any one to whom they might sell it would be obliged to look back from the date of their taking the timber— perhaps nearly as far back as fifty years —and determine — as of that date — before felling any particular tree — that it was merchantable timber — 10 inches or larger in diameter 24 inches above the ground— on December 10, 1901. If the parties to this sale had had any such intention they would have marked the trees which they deemed merchantable, and they would have declared that only the merchantable timber was being sold. The court has constructed virtually a new and different contract in this case, — by interpolating the quality, “merchantable”, and the dimensions, 10 inches or more in diameter 24 inches above the ground, — and by holding then that this merchantable quality, or these dimensions, were to be applied to the timber as of the date of the contract, and not as of the date of the felling of the timber, — perhaps nearly 50 years afterwards. If the prevailing opinion on that subject is right, the landowner might have made a valid sale of “all the timber standing, being and growing” on his land, every ten years, or every year, to another and different buyer; and, near the end of the
 
 *660
 
 fifty years, each one of the five or fifty buyers, as the case might be, would own all of the timber that was merchantable— 10 inches or larger in diameter 24 inches above the ground — on the date on which he bought his timber. The error in the prevailing opinion,- as I see it, is in deciding what the parties to th,e contract would have meant, on December 10, 1901, if they had used the term “merchantable timber”. The fact is that they did not use the term “merchantable timber”, but sold “all the timber standing, being and growing” on the 80 acres of land. Even if the contracting parties had used the term “merchantable timber” it should not be assumed that they were describing the timber as of. the date of the contract, because the buyer had 50 years in which to take it. But, when the court interpolates the word “merchantable”, it is on the presumption that the parties intended that the buyer would take only merchantable timber; which means, of course, that he would take only the timber that would be merchantable at the time of his taking it.
 

 The record shows that it required a crew of seven scientists, consisting of a- forestry engineer, four technicians, a civil'engineer, and an experienced timber estimator, to make an estimate of the average rate at' which the timber increased in diameter during the ' thirty-eight years following the dáte of the'Sale of it, December 10, 1901, — and thus' to determine the quantity -of timber that was less then 10 inches in diameter 24 inches above the ground on December 10, 1901: The tests were made by boring into the trees a hole about the size of- an ordinary lead pencil, with an instrument called an increment borer, and by counting the rings in the corings that were extracted. I doubt that Samuel C. Tippett or the Gloyds ever anticipated the invention of an increment borer, or of any other test for ascertaining the rate of growth of pine timber, when they, signed the timber deed, on December 10, 1901. The tests were made thirty-eight years afterwards. And I assume, from the prevailing opinion in this case, that the tests will have to be made again when the time comes for the timber to be cut and removed from the land.
 

 We must bear in mind that the Meridian Lumber Company was not the original buyer of this timber, but bought it from owners who, according to the public records, held title for “all the timber standing, being and growing” on the 80 acres of land.
 

 If there is any doubt whether'the parties to the sale of the timber, Tippet and the Gloyds, intended that the merchantable quality and size of the timber should be taken as of the date'of the contract, or as of the date when the timber would be felled and removed from the land, article 2474 of the Civil Code resolves the doubt in favor of the buyer and against the seller of the timber. Article 2474 is the first article in the chapter “Of The Obligations Of The Seller”, — viz:
 

 "The seller is bound to explain himself clearly respecting the extent of his obligations : any obscure or ambiguous' clause is construed against him.”
 

 .The case of Lampton Realty Co.
 
 v.
 
 Kerr, 154 La. 843, 98 So. 266, 267, is directly.
 
 *662
 
 in point. The issue that was presented in that case is stated in the first paragraph of the opinion, thus:
 

 “This case involves the proper interpretation to be placed on a deed which conveyed ‘all the pine timber’ on a body of land comprising 9,290 acres, 1:he timber being estimated at 51,600,000 feet, and the price being at the rate of $1.50 per thousand feet.”
 

 The court took into consideration that the timber was counted and estimated for the purpose of the sale. And yet the court interpreted the description “all the pine timber” as including all trees that would become merchantable timber within the 20-year time limit stipulated in the contract. The court said:
 

 "In view of the statement in the deed ‘that the timber standing thereon and hereby conveyed amounts to 51,600,000 feet,’ and that the amount of timber thus conveyed was based on an estimate of the standing trees measuring 12 inches in diameter 24 inches above the ground, and taking into consideration the testimony of the parties as to their construction of the terms of the deed and the custom prevailing among timber dealers at the time, our conclusion is that it was the intention of the seller to sell and of the buyer to buy only such timber as was then suitable to be manufactured into lumber, or that might become' suitable to be so manufactured at any time during the period of 20 years in which the purchaser was given the right to cut and remove the' said timber. The'purchaser could not be restricted to" the size of the timber "suitable to be sawed-in-to lumber at the date of the contract. He had 20 years within which to cut and remove the timber, and all trees which from growth became suitable to be manufactured during that period were included in the purchase.”
 

 The case of Dowies v. W. R. Pickering Lumber Co., 159 La. 860, 106 So. 331, was different from this case, in that the timber there was described in the contract of sale as the “standing merchantable pine timber” on the lands described in the deed. The buyer was allowed 20 years in which to cut and remove the timber. Within the 20 years the buyer cut and removed small pine saplings, as well as the merchantable timber. .The landowner sued for the value of the saplings that were taken from the land; and the court decided, of course, that the sale of the “merchantable pine timber” did not mean or include the small saplings.
 

 In the case of American Creosote Works v. Campbell, 172 La. 866, 135 So. 659, the American Creosote Works had bought* from Campbell “all of the merchantable pine timber” on his land, and was given ten years in which to remove the timber from one part of the land and one year in which to remove it from the other part of the land. Within two. and a half years after the date of the sale the American Creosote Works cut .and removed all of the merchantable pine timber: and abandoned the land. About two years. after-wards Campbell sold what timber was left on- the land to Duncan and McMichael, and they cut and removed, approximately 130,000 feet' of timber: The American.
 
 *664
 
 Creosote Works sued Campbell and Duncan and McMichae'l for the value of the timber which they cut and removed from the land. The only question in the case was whether the plaintiff owned the timber remaining on the land after “the plaintiff had gone over the entire tract and had removed therefrom what it considered and claimed to be the merchantable pine timber.” That expression is quoted from the opinion in the case. And now I quote the court’s interpretation of the contract, to show that the statement, made only incidentally by the court, that the timber that was sold was only that which was merchantable on the date of the sale, was not pertinent to the issue in the case,— viz:
 

 “Plaintiff, having removed the merchantable timber from the entire tract of land, had no further rights under its contract. Counsel for appellant call our attention to the fact that plaintiff was granted ten years from the date of deed ‘within which to cut and remove said timber from said lind.’ That clause in the deed, however, cannot be construed to mean that the vendee was given the right to continue the cutting and removal of timber from the land over the entire period of ten years. What that clause means is that the vendee had the right to go upon the land at any time within the ten-year period for the purpose of removing the timber which it purchased; that is, the timber which was merchantable on the date of the purchase. The right to go upon the land for that purpose could have been exercised at any time within the ten-year period. But, when the vendee once exercised that right and removed the timber which it purchased, all privileges given it under the contract ceased. While the vendee could exercise its right of removal at any time within the ten-year period, yet, if it chose to remove its timber at the beginning of that period, the contract was at an end after the right was exercised. Taylor v. Southland Lumber Co., Inc., 162 La. 535, 110 So. 746.
 

 “A person who purchases timber under contract like the one under consideration, that is, certain designated timber with right of removal within a specified period, may exercise his right and remove the timber from a part of the tract and cease operations for a time, without losing the right to remove his timber from the remaining portion of the land. But, if he goes over the entire tract and removes therefrom the timber which he purchased, he cannot later go upon the cut-over land and renew operations, even though the time given for removal has not expired.”
 

 We must bear in mind that it was stipulated in the contract of sale by Campbell to the American Creosote Works that Campbell sold only the “merchantable” pine timber. There was no dispute in that case as to whether the term “merchantable” meant “merchantable at the time of the sale” or “merchantable at the time when the timber was to be taken from the land”. There was no occasion for such a dispute because the American Creosote Works cut and removed the timber within two and a half years from the date of the contract. I respectfully submit, therefore, that the incidental statement in the opinion in that
 
 *666
 
 ■case, that the term “merchantable pine timber” meant “the timber which was merchantable on the date of the purchase”, was not decisive of the question that is presented in this case.
 

 The cases decided in other jurisdictions, cited in the prevailing opinion in this case, are for the most, part perhaps distinguishable from this case. In the cases that are not distinguishable the decisions are not controlling here.